UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DEBORAH I. BRADLEY,

                 Plaintiff,

        - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

                 Defendant.

-------------------------------------------------------X

**MEMORANDUM & OPINION**

Case No. 13 CV 449 (PKC)

PAMELA K. CHEN, United States District Judge:

The instant action is Plaintiff Deborah Bradley's second appeal in the twelve-year history of her disability claim. Bradley's first appeal resulted in a remand to the Commissioner for a determination on whether Bradley could perform other work. *See Bradley v. Astrue*, No. 05 CV 6106, slip op. at 1 (E.D.N.Y. Dec. 23, 2009) ("*Bradley I*"). Upon remand, the Administrative Law Judge ("ALJ") determined that Bradley was not eligible for benefits. This appeal followed.

The parties now cross-move for judgment on the pleadings. While they agree that the ALJ committed errors on remand, they disagree as to the proper remedy. Bradley seeks a remand solely for the calculation of benefits. The Commissioner, in turn, seeks remand for further administrative proceedings.

For the reasons set forth below, the Court remands Bradley's claim to the Commissioner solely for the calculation and award of benefits.

---

[1]     The action was originally brought against Michael J. Astrue in his capacity as Commissioner of Social Security. Carolyn W. Colvin is automatically substituted as a party to this action because she succeeded Mr. Astrue as Acting Commissioner. *See* Fed. R. Civ. P. 25(d).

# I.    BACKGROUND

The Court relies on the facts set forth in *Bradley I* for Bradley's relevant employment and medical history through 2009.  Relevant facts from *Bradley I*, Bradley's medical treatment from 2009 onward, and the proceedings on remand are discussed below.

## A.    Employment History and Accident

Bradley was born in Queens, New York in June 1956.  (Tr. 346).  She is a high school graduate and took classes for one year at Manhattan Community College.  (*Id.*)  Her employment history includes positions as a clerical worker, an assistant buyer at a department store, a real estate agent, a case manager for a social services non-profit organization, director of that social services non-profit organization, a community relations officer, and finally, a letter carrier for the U.S. Postal Service.  (*Id.*)  She began her position with the U.S. Postal Service in March 1999; her duties required her to walk up to five hours a day, drive the mail truck, and push mail carts, sometimes weighing as much as 100 pounds.  (*Id.*)

On or around August 30, 2001, a tow truck hit Bradley's mail truck while she was pulling away from the curb.  (*Id*. at 288).[2]  Following the accident, Bradley was no longer permitted to "drive out" the mail, and so began "push[ing] the mail out" in a cart.  (*Id.*).  After a week of pushing the mail, Bradley could not get out of bed.  (*Id.*).  She took two weeks off from work, but upon her return, her fingers went numb when sorting the mail, until she eventually lost feeling on her right side.  (*Id*. at 289).  She stopped working on September 22, 2001 and did not return to work for almost a year.  (*Id*. at 347).

---

[2]    The exact date of the accident is not clear from the record.  Bradley testified that the accident occurred on August 30, 2001, (Tr. 288), but ALJ Marilyn L. Hoppenfeld's decision lists the accident as August 31, 2001, (Tr. 346).

After a year on workers' compensation, Bradley attempted to return to "light duty" on September 9, 2002, which included tasks such as sorting misdirected mail, placing stickers on envelopes, and helping customers in the lobby of the post office. (*Id.*). After several weeks, Bradley suffered a re-injury of her right arm and went back on workers' compensation. (*Bradley I* at 3). She has not worked since October 22, 2002. (*Id.*).

**B.      Relevant Medical History Post-Accident**

      1.      <u>Medical Treatment Sought</u>

Bradley first sought treatment from her family practitioner, Dr. Bernard Levine, D.O., on October 12, 2001. (Tr. 289). Dr. Levine diagnosed Bradley as having an acute right cervical spasm and left cervical spasm with right radiculopathy to right fingers or fingertips.[3] (*Bradley I* at 4 (citing Tr. 120, 210)). Dr. Levine prescribed a muscle relaxant (Flexaril) and an anti-inflammatory (Oruvail) to Bradley. (*Bradley I* at 4). At Bradley's follow-up appointment on October 17, 2001, Bradly only showed 10% improvement, and so Dr. Levine referred her to a neurologist, Dr. Ellen Braunstein, whom she first saw in October 2002. (*Id.*) Bradley continued to see Dr. Levine throughout 2002 and 2003.

Bradley began physical therapy in November 2002, and by her next visit to Dr. Levine on November 30, 2001, Bradley's cervical radiculopathy was showing some improvement, but a note in her chart suggested that she was unable to return to work in her former capacity. (*Id.* at 4–5).[4]

---

[3]      Cervical radiculopathy is the "damage or disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed." *See* http://www.webmd.com/pain-management/pain-management-cervical-radiculopathy (last visited Apr. 30, 2015). Damage to nerve roots in this area can cause pain and the loss of sensation into the arm and hand. (*Id.*).

[4]      The note read: "When planning to return to work <u>can never go back to same mail work – light duty only</u>." (*Bradley I* at 5 (citing Tr. 118) (emphasis in original)).

Bradley subsequently saw Dr. Braunstein for several appointments. On January 17, 2002, Dr. Braunstein also diagnosed Bradley as having cervical radiculopathy and prescribed different pain medication to Bradley. (*Id*. at 5 (citing Tr. 101–02). A month later, on February 14, 2002, Dr. Braunstein found Bradley to be "[n]eurologically . . . unchanged." (*Id*. at 6 (citing Tr. 100)). On March 27, 2002, Bradley reported neck pain to Dr. Braunstein, but also stated that she felt she was doing better. (*Id*.).

Yet a few days later, on April 1, 2002, Bradley saw Dr. Levine again and reported that her condition had not improved. (*Id*.). A note was entered on Bradley's chart stating "[c]an not return to work still totally disabled. Condition not improving[.]" (*Id*. (citing Tr. 116, 214)). Dr. Levine referred Bradley to Manhattan Physical Medicine and Rehabilitation ("MPM"). (*Id*.).

In April 2002, Bradley began physical therapy three times a week at MPM and was treated by Dr. Barbara Schwartz. (Tr. 103, 104). While undergoing physical therapy at MPM, Bradley continued to see Dr. Levine. Bradley returned to Dr. Levine for appointments on May 7, 2002 and June 12, 2002. (*Bradley I* at 7). Bradley continued to have radiculopathy on the right side and some on the left side as well. (*Id*.). Dr. Levine noted that Bradley remained "totally disabled," but that her condition had improved by approximately 50%. (*Id*.). At Bradley's July 9, 2002 appointment with Dr. Levine, Bradley reported neck pain on both sides, cervical spasms on the right side, and numbness and tingling in her arms. (*Id*.). Dr. Levine's records also note receipt of a letter from Dr. Schwartz, stating that Bradley could return to work with limited activity as of July 14, 2002. (*Id*.). Bradley did not return to work. (*Id*. at 8).

Bradley had follow-up appointments with Dr. Levine on August 9, 2002; September 5, 2002, and October 1, 2002. (*Id*. at 8). Dr. Levine's records show that Bradley's condition remained essentially unchanged during this period. (*Id*.). In a September 18, 2002 letter to Dr.

Levine, however, Dr. Schwartz reported that Bradley's pain had worsened, that she still had limited range of motion in the cervical spine, and that Dr. Schwartz had administered myofascial trigger point injections. (Tr. 124). Dr. Schwartz recommended that Bradley continue physical therapy. (Tr. 125).

On November 24, 2003, an MRI of Bradley's lumbar spine showed a disc bulge. (Tr. 162). Bradley then began seeing Dr. Eric Freeman, from December 13, 2003 to July 12, 2004. (Tr. 188). According to Dr. Levine's chart, Dr. Freeman placed Bradley on pain medications (Tr. 221) and referred her to Dr. Jeffrey Hetler, an anesthesiologist. (Tr. 144). Dr. Hetler diagnosed Bradley with lumbar radiculitis, and performed three lumbar epidural injections of an anti-inflammatory for her pain. (*Bradley I* at 15–16). On May 5, 2004, however, Bradley reported that the injections had not helped, but that in fact, her pain had gotten worse. (*Id*. at 16).

On October 1, 2004 and October 15, 2004, Bradley saw Dr. Dina Miller, a colleague of Dr. Schwartz's and another doctor employed at MPM. (*Id*. at 16–17). Dr. Miller found that Bradley's cervical range of motion was somewhat limited with respect to rotation, and that Bradley's right side was "extremely tender" in her neck and back muscles. (*Id*.). Dr. Miller diagnosed Bradley with a "prior C5-C6 disc bulge that may be undergoing disc disease," a "quiescent" C6 radiculopathy and thoracic outlet syndrome, and "current and active myofascial pain syndrome at the cervical, right lumbar area, right trapezius, right rhomboid and right costovertebral area." (*Id*. (citing Tr. 149)).[5]

---

[5]     "C5" and "C6" refer to certain cervical vertebrae, which are vertebrae below the skull and in the neck. Thoracic outlet syndrome is a group of disorders that occur when the blood vessels or nerves in the space between a person's collarbone and first rib become compressed. This condition can pain to the shoulders and neck and numbness in the fingers. Common causes of thoracic outlet syndrome include physical trauma from a car accident and job-related repetitive injuries. *See* http://www.mayoclinic.org/diseases-conditions/thoracic-outlet-syndrome/basics/definition/con-20040509 (last visited May 20, 2015).

Bradley also saw Dr. Nancy Epstein, a neurosurgeon, in October 2004 and underwent either a MRI or CT scan on her spine. (*Bradley I* at 17). In a letter to Dr. Levine, Dr. Epstein reported that the CT scan showed mild disc degeneration at C5-C6, mild stenosis, and mild foraminal stenosis[6], but was otherwise a normal study. (*Id*. at 18 (citing Tr. 158)). The administrative transcript, however, also contains, a report from Dr. Epstein's office detailing an MRI performed on Bradley in October 2004, showing levoscoliosis[7] in the lower thoracic and lumbar spine, degenerative changes in all of the lumbar discs with varying degrees of disc bulging and vertebral ridging, and mild central spinal stenosis. (Tr. 151–52). Dr. Epstein referred Bradley to Dr. Slavina Gardella, another neurologist. (*Bradley I* at 18).

Bradley first saw Dr. Gardella on November 8, 2004, and then saw her every two weeks until December 20, 2004. (*Id*.; Tr. 170). Dr. Gardella found that Bradley had a "somewhat diminished" range of motion in the lumbar area, and, after conducting some tests, opined that Bradley had a light L5 radiculopathy. (*Bradley I* at 18–19). Dr. Gardella referred Bradley to an orthopedic and spine surgeon, Dr. Sebastian Lattuga, for a consultation. (*Id*. at 19).

In a January 25, 2005 report, Dr. Lattuga diagnosed Bradley as having lumbar stenosis. (*Id*. (citing Tr. 253)). Though he found that Bradley walked and stood normally, and had a full range of motion in her extremities, he also found that Bradley had restricted ranges of motion with respect to her spine, as well as tenderness and spasms around the lumbar spine. (*Id*.).

---

[6]    Foraminal stenosis "is the narrowing of the cervical disc space caused by enlargement of a joint . . . in the spinal canal. The majority of symptoms with this type of cervical spinal stenosis are usually caused by one nerve root on one side." *See* http://www.spine-health.com /glossary/ foraminal-stenosis (last visited May 20, 2015).

[7]    Levoscoliosis is the curvature of the spine to the left side. *See* http://www.spine-health.com/conditions/scoliosis/scoliosis-types (last visited May 20, 2015).

Dr. Mahomed Nour, an orthopedic surgeon, evaluated Bradley on September 29, 2005 at the request of Bradley's attorney. (Tr. 263). Dr. Nour diagnosed Bradley with chronic cervical sprain/strain post-trauma, chronic lumbar sprain/strain post-trauma, and internal derangement of the right shoulder. (*Id*. at 267). He opined that Bradley was permanently totally disabled. (*Id*.).

After Bradley's case was remanded from the district court, the administrative record was supplemented with additional medical records (Tr. 465–525). Bradley continued to see Dr. Schwartz and other MPM physicians, and Bradley continued physical therapy. (*Id*.) A February 1, 2010 x-ray of Bradley's lumbar spine showed mild lumbar levoscoliosis with a rotary component and lumbar posterior facet arthropathy.[8] (*Id*. at 487). A March 3, 2010 MRI of Bradley's right shoulder showed a moderate to partial tear of the bursal surface of the distal supraspinatus tendon.[9] (*Id*. at 502). In June 2010, Bradley was briefly hospitalized with severe back pain. (*Id*. at 521).

2. <u>Treating Physicians' Functional Assessments</u>

The administrative record includes several assessments of Bradley's functional capacity and impairment by treating or examining physicians.

In a New York State Office of Temporary and Disability Assistance questionnaire dated August 21, 2003, Dr. Schwartz reported Bradley's diagnoses as cervical radiculopathy, thoracic outlet syndrome, and right shoulder impingement. (Tr. 103). Dr. Schwartz's questionnaire

---

[8]     Facet joints are two joints in the posterior aspect of the spine. *See* http://emedicine.medscape.com/article/94871-overview (last visited May 20, 2015). Arthropathy is a collective term for any disease of the joints. *See* http://www.spine-health.com/glossary/arthropathy (last visited May 20, 2015).

[9]     The supraspinatus muscle "is responsible for elevating the arm and moving it away from the body. The tendon of the supraspinatus muscle is one of four tendons that stabilize the shoulder joint and constitute the rotator cuff." *See* http://www.medicinenet.com/script/ main/art.asp?articlekey=8198 (last visited May 20, 2015).

responses indicated that Bradley "cannot work" and "cannot push, pull[.]" (Tr. 107). The responses also indicated that Bradley can occasionally lift and carry less than 10 pounds, can sit for less than 6 hours a day, and cannot push or pull. (Tr. 108–09).

In 2010, Dr. Schwartz updated these recommendations in three letters, one to Bradley's general practitioner and two addressed "To Whom It May Concern." In her March 15, 2010 letter to Dr. Levine, Dr. Schwartz stated that Bradley could not return to her prior level of work, would need to avoid all overhead activities, and could not push or pull more than 5 lbs. (Tr. 500). Bradley could perform some office work for short periods of time with frequent rests for stretching. (*Id*.). Dr. Schwartz's two "To Whom It May Concern" letters, one dated July 19, 2010 and the other dated September 13, 2010, stated that Bradley was permanently disabled, could not walk more than 30 minutes at a time, and would need frequent rest periods. (*Id*. at 521, 524–25). Dr. Schwartz specifically noted that Bradley was not able to sit for 6 hours total at any given time. (*Id*. at 525).

In a spinal impairment questionnaire dated January 26, 2005, Dr. Gardella reported Bradley's diagnosis as lumbar radiculopathy with an undetermined prognosis. (Tr. 170; *see also Bradley I* at 20). Dr. Gardella noted Bradley's symptoms as tenderness, spasms, and a limited range of motion in the lumbar spine, and that her condition would interfere with her ability to keep her neck in a constant position. (Tr. 171). Dr. Gardella opined that Bradley could not stand, walk, or sit for more than an hour at a time; recommended that she get up and walk for a half-hour after every half-hour of sitting; and recommended that she rest about every half-hour. (Tr. 173). Dr. Gardella stated that Bradley could occasionally lift and carry weights of up to 10 pounds, but could not lift or carry anything frequently. (Tr. 173-74).

Dr. Freeman filled out the same questionnaire as Dr. Gardella on April 17, 2005. (*Bradley I* at 20). Dr. Freeman stated that he saw Bradley on a monthly basis through July 12, 2004. (Tr. 188–94). Dr. Freeman diagnosed Bradley with a lumbar herniated disc, noting she had radicular pain in the legs on a daily basis. (Tr. 190) Dr. Freeman stated that, in an 8-hour day, Bradley could sit for three hours, stand or walk for three hours, and that it was "necessary or medically recommended" that Bradley not sit or stand/walk continuously in a work setting. (Tr. 191). Dr. Freeman noted that Bradley could "frequently" lift or carry 0–5 lbs., occasionally lift 5-10 lbs. and 10-20 lbs., but that she should never lift anything more than 20 lbs. (Tr. 191–92).

In a multiple impairment questionnaire dated September 29, 2005, Dr. Nour indicated that Bradley could sit and stand/walk for 0-1 hour in each 8-hour day, and could lift and carry up to 5 lbs. frequently and 10 lbs. occasionally. (Tr. 271–72). Dr. Nour recommended that Bradley get up and move every 15 minutes when sitting. (Tr. 271). He also noted significant limitations performing repetitive reaching, handling, fingering and lifting, and that she was markedly limited in using the right arm for grasping, turning and twisting objects, performing fine manipulations, and reaching. (Tr. 272–73).

## C.     Procedural History

### 1.     2005 Decision by ALJ O'Leary

Bradley first filed her application for disability benefits on August 7, 2003. (Tr. 342). Administrative Law Judge ("ALJ") Dennis O'Leary denied the claim on July 28, 2005, concluding that Bradley was not disabled under the fourth step of the five-step analysis applicable to disability claims. (*See Bradley I* at 23–26 (discussing ALJ's decision)). ALJ O'Leary found that Bradley retained the residual functional capacity ("RFC") to perform past relevant work. (*Id.* at 26). The Appeals Council denied review of the decision on November 18, 2005, rendering it final. (Tr. 342). Bradley appealed the denial to this Court. (*Id.*)

2.      First District Court Remand

On December 21, 2009, the Honorable Sandra L. Townes remanded Bradley's claim pursuant to the fourth sentence of 42 U.S.C. § 405(g). Judge Townes determined that ALJ O'Leary "did not properly apply – or even acknowledge the existence of – the treating physician rule." (*Bradley I* at 29). Though ALJ O'Leary had reviewed the medical records provided by Bradley's physicians, ALJ O'Leary did not distinguish any providers as "treating physicians." (*Id.*) Judge Townes noted that three of Bradley's physicians should have been considered "treating physicians" – Drs. Freeman, Gardella, and Schwartz – and ALJ O'Leary should have deferred to their opinions or provided good reason for not doing so. (*Id.* at 31). ALJ O'Leary, however, failed to do either. (*Id.*)

Judge Townes noted that all three doctors had provided assessments of Bradley's functional capacity. Though they disagreed on the exact amount of time Bradley could sit during an eight-hour work day, they all agreed that she "could sit for *less than* six hours per eight-hour work day." (*Id.* at 30) (emphasis added). "Similarly, all three doctors agreed that plaintiff *could not frequently* lift and carry objects weighing up to ten pounds." (*Id.* at 31) (emphasis added).

Judge Townes also found that ALJ O'Leary's determination that Bradley retained the RFC to do her past relevant work was "based on less than substantial evidence." (*Id.* at 32; *see also id.* at 33 ("[T]here was no evidence to support the ALJ's conclusion that plaintiff 'retained the residual functional capacity to perform the exertional demands of light work'")). ALJ O'Leary's decision failed to cite to any portion of the record to support the finding that Bradley could perform light work. (*Id.*). Upon an examination of the administrative record, Judge Townes determined that the only record evidence supporting the ALJ's conclusion was an assessment form that should have been completed by a "medical consultant" but had instead been signed by a person identified only by the initials "RDH," who crossed out all references to

"medical consultant" on the signature line, implying a lack of any medical qualifications (*id.* at 33); the assessment form's conclusions "were wholly unsupported by the evidence in the record." (*Id.* at 34).

Judge Townes remanded Bradley's application to the ALJ with specific instructions to conduct the fifth step of the analysis applicable to disability claims. (*Id.* at 35). Thus, the Commissioner had the burden to show that Bradley was not disabled because there was other work that she could perform. (*Id.*)

### 3.    Proceedings on Remand

Upon remand, Bradley's case was assigned to ALJ Hoppenfeld. ALJ Hoppenfeld held a *de novo* hearing on Bradley's application on May 20, 2010. (Tr. 342). The hearing was continued to September 16, 2010. (*Id.*) Bradley appeared at both hearings. At the continued hearing, ALJ Hoppenfeld heard testimony from Dr. Edward Spindell, an independent medical expert and Board Certified orthopedist; Dr. Charles Plotz, an independent medical expert and Board Certified internist; and Andrew Pasternak, an independent vocational expert. (*Id.* at 342-43).

Dr. Spindell testified by phone at both hearings. He opined that Bradley could perform a range of light work. (Tr. 580, 647-48). He testified that Bradley could stand for 6 hours if she could sit for 15 minutes per hour and could sit for 6 hours a day if she were permitted a sit/stand option. (Tr. 579-80). He also opined that Bradley could lift 20 lbs. occasionally and 10 lbs. frequently, but that she should not lift above shoulder level with her right arm. (Tr. 647). He stated that Bradley should avoid cold and damp environments, climbing, and being around dangerous machinery. (Tr. 647). Though he stated he had reviewed the administrative record, Dr. Spindell could not recall seeing any opinions on Bradley's functional capacity other than two he was directed not to consider as unqualified medical sources. (Tr. 582).

Dr. Plotz, a specialist in internal medicine and rheumatology, testified that he agreed with the testimony of Dr. Spindell. (Tr. 650-51).

Pasternak, the vocational expert, opined that an individual of Bradley's age, education, and work history who was subject to the limitations set forth by Dr. Spindell (light exertional work with no reaching beyond shoulder level, ad who was prohibited from working in cold environments, climbing, and working with risky machinery), could not perform any of Bradley's past work. (Tr. 659–60). He stated, however, that Bradley could perform other work as a general clerk, file clerk, payroll clerk, mail clerk, credit clerk, or receptionist. (Tr. 661–62, 666–67, 673). He stated that an individual who required a sit/stand option could perform such work, but conceded that he did not know whether these positions would be available with a sit/stand option. (Tr. 669, 670). He conceded that an individual limited as described by Dr. Freeman, who could only stand or walk for up to 3 hours in an 8-hour work day and had to get up from sitting every half-hour, could not perform any work. (Tr. 663).

Bradley testified before ALJ Hoppenfeld as well. She stated that she had stopped working after she was injured in the 2001 accident. (Tr. 551, 555). Bradley stated that she has pain in her neck, arm, lower back, and down her right and left leg. (Tr. 559). She can only sit for 30 minutes before she must get up and move around. (Tr. 566). (Indeed, Bradley had to stand up during her testimony to ease her pain.) (Tr. 567). She stated that she had been in physical therapy from 2001 until the date of the hearing. (Tr. 557). She has stiffness of the arm and pins and needles with repetitive use of the right arm. (Tr. 665). She has difficulty using a computer. (Tr. 665). She can drive, but only travels locally; she recalled two instances in the past ten years where she traveled out of state by car, one for her son's graduation and the other

for a funeral.  (Tr. 542, 571, 617).  When she took these out-of-state trips, she had to get out of the car frequently for breaks.  (Tr. 572).

### 4.    Second ALJ Decision

On March 22, 2011, ALJ Hoppenfeld issued the decision that is the subject of this case. ALJ Hoppenfeld concluded that Bradley was not disabled under the fifth step of the analysis applicable to disability claims, because she retained the RFC to perform other work.  (Tr. 345). In reaching this conclusion, ALJ Hoppenfeld determined that, although Bradley could not perform the full range of light work, Bradley had the RFC "to perform light work or work that involves lifting twenty pounds occasionally, ten pounds frequently, walking, standing and sitting six hours out of an eight hour day" but that Bradley was "limited in overhead reaching with her right shoulder and should avoid cold environments."  (*Id.*).

Thereafter, Plaintiff requested review of ALJ Hoppenfeld's decision. (Tr. 330).  On December 5, 2012, the Appeals Council declined to assume jurisdiction, rendering ALJ Hoppenfeld's decision final. (Tr. 300–02).  Bradley filed this action on January 25, 2013.  (Dkt. 1.)  The administrative transcript was filed on January 30, 2014 and both parties moved for judgment on the pleadings on the same date.

## II.    STANDARD OF REVIEW

### A.    District Court Review of the Commissioner's Decision

In reviewing a final decision of the Commissioner, the Court's duty is to determine whether it is based upon correct legal standards and principles and whether it is supported by substantial evidence in the record, taken as a whole.  *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (the Court "is limited to determining whether the [Social Security Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard").  "'Substantial evidence is more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (citations omitted). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

**B.      Eligibility Standard for Social Security Disability Benefits**

The Social Security Act ("the Act") provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for Social Security disability benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999).

The Act's regulations prescribe a five-step process for the evaluation of disability claims. First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

If the claimant is not currently engaged in "substantial gainful activity," the Commissioner proceeds to the second step, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third step, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations (the "Listings"). If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

If the impairment does not meet or equal a listing in Appendix 1, the Commissioner proceeds to the fourth step, which is whether, despite the claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is used to assess whether he or she can perform one of the five categories of work recognized by Social Security Administration ("SSA") regulations: very heavy, heavy, medium, light and sedentary. 20 C.F.R. § 404.1567(a). Sedentary is the least rigorous of the five categories. *Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998) (citing 20 C.F.R. § 404.1567). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that s/he can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists

in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving her case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir. 2004).

## III.    DISCUSSION

While the parties agree that ALJ Hoppenfeld committed error in the proceedings upon remand, they disagree as to the precise nature of those errors and the appropriate remedy. The Commissioner argues that Bradley's case should be remanded for further consideration of the evidence and application of the correct legal standards because, although the ALJ failed to fully evaluate all medical opinions in the record, identify the treating sources she considered, and failed to state the weight given to each treating physician's opinion, the record does not definitively establish that Bradley is disabled. (Def. Br. at ECF 20–26).[10]  Bradley agrees that the ALJ made such errors, as well as others, but argues that the current record requires the Court to remand solely for a calculation and award of benefits. (Pl. Br. at ECF 18–26). For the reasons set forth below, the Court finds that remand for further consideration of the evidence under a correct application of law would be pointless and therefore remand solely for an award of benefits is appropriate.

---

[10]    "ECF" refers to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

## A. The ALJ Did Not Contravene The Law Of the Case By Re-Assessing Bradley's Residual Function Capacity

Bradley argues that ALJ Hoppenfeld contravened *Bradley I* and thus the law of the case by re-assessing Bradley's RFC to conduct step five of the disability analysis. (Pl. Br. at ECF 15-18). According to Bradley, because Judge Townes found that Bradley's three treating physicians gave opinions that were entitled to controlling weight, "the only issue was whether [Bradley's] limitations would preclude Plaintiff from performing all other work[.]" (Pl. Br. at ECF 17). Instead, "the ALJ violated the law of the case doctrine and undertook a new RFC finding after taking additional testimony from two medical experts over the objections of Plaintiff's counsel", which was "expressly prohibited by Judge Towne's opinion." (*Id.*).

Courts in the Second Circuit have regularly acknowledged that remand instructions to an ALJ from a federal district court in Social Security cases constitute the law of the case. *See Gladle v. Astrue*, No. 12 CV 284, 2013 WL 4543147, at * 3 (N.D.N.Y. Aug. 27, 2013); *Calderon v. Astrue*, 683 F. Supp. 2d 273, 276–77 (E.D.N.Y. 2010) (finding ALJ violated the law of the case by disavowing his prior step-four determination, which the district court had implicitly affirmed). "The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)). The doctrine "ordinarily forecloses relitigation of issues expressly or impliedly decided by [an] appellate court." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 208 (2d Cir. 2013)

(quoting *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002) (internal quotation marks omitted)).[11]

In *Bradley I*, Judge Townes found error with ALJ O'Leary's step four determination that Bradley could perform her past relevant work, which was based on the ALJ's finding that Bradley had the RFC to perform "light work." Judge Townes determined that, in coming to this conclusion, ALJ O'Leary had failed to give controlling weight to the opinions of Bradley's three treating physicians (Freeman, Gardella, and Schwartz), or else provide "good reasons" for the failure to do so. (*Bradley I* at 31). Judge Townes also determined that ALJ O'Leary's conclusion that Bradley "retained the [RFC] to perform the exertional demands of light work" was not supported by *any* evidence. (*Id*. at 33). Thus, Judge Townes remanded with instructions to conduct step five of the Social Security disability analysis.

It is well-established that the step five determination is dependent on the claimant's RFC, which is determined at step four. *See* 20 C.F.R. § 404.1520(a)(4). While *Bradley I* identified errors with ALJ O'Leary's conclusion that Bradley could perform light work, it did not impliedly reach a conclusion as to Bradley's proper RFC.[12] By identifying errors in ALJ O'Leary's RFC

---

[11]     While the Second Circuit has not explicitly addressed the application of the law of the case doctrine to Social Security appeals, district courts in the Second Circuit, as well as a number of other courts around the country, have found the doctrine to apply. *See Calderon v. Astrue*, 683 F. Supp. 2d 273, 276 (E.D.N.Y. 2010) (citing *Grigsby v. Barnhart*, 294 F.3d 1215 (10th Cir. 2002); *Brachtel v. Apfel*, 132 F.3d 417 (8th Cir. 1997); *Key v. Sullivan*, 925 F.2d 1056 (7th Cir. 1991); *Ischay v. Barnhart*, 383 F. Supp. 2d 1199 (C.D. Cal. 2005) (citing *Holst v. Bowen*, 637 F.Supp. 145 (E.D. Wash. 1986)); *Carrillo v. Heckler*, 599 F. Supp. 1164 (S.D.N.Y. 1984)); *see also Gladle*, 2013 WL 4543147, at * 3. The Court similarly finds it appropriate to follow apply the doctrine here.

[12]     Indeed, the ultimate determination of a claimant's RFC is an issued reserved to the Commissioner. *See Knight v. Astrue*, No. 10 CV 5301, 2011 WL 4073603, at *8 (E.D.N.Y. Sept. 13, 2011) ("The ultimate determinations of a claimant's RFC or disability are reserved to the Commissioner."); 20 C.F.R. § 404.1527(d)(2) ("the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner.").

determination, *Bradley I* left ALJ Hoppenfeld without a legally binding determination of Bradley's precise exertional capacity to apply in step five. In essence, while *Bradley I* determined what Bradley's RFC was *not* (*i.e.*, not light work), it did not rule on what Bradley's RFC actually *was*.

Thus, to conduct a proper step five analysis, ALJ Hoppenfeld had to determine Bradley's RFC. The Court therefore finds that it was not error for ALJ Hoppenfeld to assess Bradley's RFC upon remand.[13]

### B. The ALJ Failed To Follow The Treating Physician Rule

While it was not error for the ALJ to make a determination as to Bradley's RFC, the Court finds that the ALJ committed error in making that determination by failing to follow the treating physician rule. There is no dispute between the parties on this issue; the Commissioner concedes that the ALJ failed to fully evaluate all medical opinions as required by SSA regulations and Second Circuit case law. (*See* Def. Br. at ECF 20; Pl. Br. at ECF 18–22).

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). According to the SSA regulations, the Commissioner will give "controlling weight" to "a treating source's opinion on the issue(s) of the nature and severity of . . . impairment(s) [so long

---

[13]     Bradley also argues that *Bradley I* required ALJ Hoppenfeld to give controlling weight to the opinions of Drs. Schwartz, Gardella and Freeman because *Bradley I* found that these opinions were "well supported by medically acceptable clinical and laboratory diagnostic techniques . . . and not inconsistent with substantial evidence" in the record. (Pl. Br. at ECF 15-16 (quoting *Bradley I* at 31)). However, Bradley's characterization of *Bradley I* is incomplete— Judge Townes did not simply direct the ALJ to give controlling weight to the treating physicians' opinions, but stated that, as an alternative, the ALJ could have provided "good reasons" for not doing so. (*See Bradley I* at 31.).

as the opinion] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), *now codified at* 20 C.F.R. § 404.1527(c)(2)).[14] In any event, the Commissioner must "give good reasons in [its] notice of determination or decision for the weight give[n] [claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

Despite the fact that *Bradley I* detailed the ways in which ALJ O'Leary failed to follow the treating physician rule, on remand ALJ Hoppenfeld committed the same error in her decision. Though the 2011 ALJ decision lists the medical reports in Bradley's records, nowhere in the decision does it even identify the weight given to any of the medical opinions summarized.[15] Neither does the 2011 ALJ decision specifically identify Drs. Schwartz, Freeman, or Gardella as Bradley's treating physicians, though *Bradley I* identified them as such and found that their opinions were consistent with the record.[16] The decision also omits any reference to Dr. Nour's evaluation and does not explain why Dr. Nour's opinion was not credited. *See Roman v. Astrue*,

---

[14] These factors include: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the level of relevant evidence to support the opinion, the consistency of the opinion with the record as a whole, whether the source is a specialist in the area at issue, and other factors a claimant may bring to the Commissioner's attention. 20 C.F.R. § 404.1527(c)(2)-(6).

[15] The one exception is where the decision notes that no weight was given to the report of [the now-discredited] Dr. Mohammed Khattak." (Tr. 352).

[16] The decision obliquely refers to "the claimant's treating physicians" but fails to specify whom the ALJ considered to be included in this group. (Tr. 352).

No. 10 CV 3085, 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012).[17]   And though the decision references Dr. Freeman's assessment of Bradley's functional capacity, it does not include the functional assessments of Drs. Schwartz or Gardella when discussing the medical opinions in the record.

Indeed, in finding that Bradley's RFC was consistent with light work subject to certain limitations, ALJ Hoppenfeld appears to have exclusively relied on Dr. Spindell's testimony, despite the fact that Dr. Spindell had never examined Bradley, and testified by telephone.  The similarities between Dr. Spindell's opinion and the ALJ's ultimate finding are obvious. (*Compare* Tr. 345 ("[I]t is found that . . . claimant had the residual function capacity to perform light work or work that involves lifting twenty pounds occasionally, ten pounds frequently, walking, standing and sitting six hours out of an eight hour day, except that she is limited in overhead reaching with her right shoulder and should avoid cold environments.") *with* Tr. 579–82, 647–48 (stating "Bradley can stand six hours with the ability to sit at will or at least every 15 minutes. She can sit during the same period of time for six hours with the ability to stand periodically.  She can lift occasionally twenty pounds, frequently ten pounds. Referable [*sic*] to the right shoulder, it might be appropriate for her to avoid lifting above shoulder level. . . it would be appropriate for her to avoid extreme cold and damp environment [*sic*]."")).[18]   None of the assessments provided by Bradley's treating physicians opined that she could sit for as long as six hours a day; rather, the opinions of Drs. Schwartz, Gardella, Freeman and Nour are all in

[17]      The fact that Dr. Nour examined Bradley at the behest of Bradley's counsel does not constitute automatic grounds for discounting Dr. Nour's opinion. "Before an ALJ may elect to discredit the medical conclusions of a treating physician, she must explicitly consider" the five factors cited above in footnote 10, *supra*.  *Roman*, 2012 WL 4566128, at *16.

[18]      Though even Dr. Spindell recognized that Bradley could not sit or stand continuously for six hours, ALJ Hoppenfeld's RFC finding did not include the limitations he recognized.

agreement that Bradley could not sit that long. (*See* Tr. 108–09 (Dr. Schwartz questionnaire response indicating that Bradley can sit for less than 6 hours a day); Tr. 173–74 (Dr. Gardella questionnaire response indicating Bradley can only sit for 0–1 hours a day and should not sit continuously in a work setting); Tr. 191 (Dr. Freeman questionnaire response indicating Bradley can sit for only 3 hours a day and should not sit continuously in a work setting); Tr. 271–72 (Dr. Nour questionnaire response indicating Bradley could sit and stand/walk for 0-1 hour in each 8-hour day)).[19]

In exclusively relying on Dr. Spindell's testimony and failing to give any weight to Bradley's treating physicians, ALJ Hoppenfeld clearly erred. *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (stating that in elevating the opinion of a non-examining medical adviser over the treating physician, the ALJ "violated a general rule adopted in all . . . of the circuits"); *Fernandez v. Astrue*, No. 11 CV 3896, 2013 WL 1291284 at *16 (E.D.N.Y. Mar. 28, 2013) (finding ALJ committed error by giving "significant weight to two non-examining sources and little weight to every examining source, including the treating physicians"); *Roman*, 2012 WL 4566128, at *16 ("The medical opinion of a non-examining medical expert . . . may not be accorded significant weight."). Accordingly, the Court finds that the ALJ failed to follow the treating physician rule and properly evaluate the medical evidence of Plaintiff's treating physicians.

### C.  The ALJ's RFC Determination Was Not Supported By Substantial Evidence

As discussed above, ALJ Hoppenfeld determined Bradley's RFC by adopting the testimony of the non-examining medical expert and disregarding the opinions of Bradley's

---

[19]  Indeed, Dr. Spindell himself conceded, on cross-examination, that the only record evidence supporting an RFC similar to his opinion were contained in exhibits that had been discounted because they were provided by the "now-discredited" Dr. Khattak. (Tr. 352, 582, 584).

treating physicians. Accordingly, the ALJ's RFC determination was not supported by substantial evidence.

None of the opinions by Bradley's treating physician support the ALJ's conclusion that Bradley had the capacity "to perform light work or work that involves . . . sitting six hours out of an eight hour day[.]" (Tr. 345). In fact, as discussed above, all of Bradley's treating physicians concluded the opposite. These opinions were part of the record before ALJ O'Leary in the original proceeding and once more before ALJ Hoppenfeld on remand. ALJ O'Leary noted that the functional capacity assessments supplied by Bradley's treating physicians implied that Bradley had a "less than sedentary" RFC. (*See Bradley I* (citing Tr. 16)). Judge Townes found that these opinions were not inconsistent with other substantial evidence in the record and that they were supported by medically acceptable clinical and laboratory diagnostic techniques. *Bradley I* at 29–30.

Yet ALJ Hoppenfeld disregarded these treating physicians' opinions, concluding that they had improperly opined on the ultimate legal conclusion of whether Bradley was disabled. This was highly improper. While a treating physician's legal conclusion of a claimant's RFC is entitled to no special significance, (*see* 20 C.F.R. § 404.1527(d)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)), the same cannot be said for a treating physician's medical assessment of the patient's limitations. It is clear that the opinions of Bradley's treating physicians regarding her capacity to sit and stand were in no way legal conclusions reserved to the Commissioner. All three of the opinions were provided in State-mandated questionnaire responses regarding Bradley's capacity to sit or stand, and properly opined on the nature of severity of the plaintiff's impairments. *See Fernandez*, 2013 WL 1291284 at *17 (stating that the treating physician's opinion regarding plaintiff's ability to sit, stand or carry weight was not an opinion on the issue

of legal disability but on the nature and severity of the plaintiff's impairments) (citing *Hall v. Astrue*, No. 08CV 24-A, 2009 WL 3614529, at *7 (W.D.N.Y. Oct. 26, 2009)). Accordingly, ALJ Hoppenfeld should have considered them when determining Bradley's RFC.[20]

Here, unlike cases where the treating physicians may differ in their conclusions, Bradley's treating physicians were all in agreement that she could not sit continuously in a work setting and could only do so for considerably less than 6 hours a day. The only support for the ALJ's RFC was the testimony of the non-examining medical expert, Dr. Spinelli. Accordingly, the ALJ's determination of Bradley's RFC was not supported by substantial evidence, and must be overturned. *See McKissick v. Barnhart*, No. 01 CV 1550, 2002 WL 31409933, at *16 (finding the Commissioner's decision was not supported by substantial evidence where treating physicians agreed that plaintiff was limited in her ability to stand and walk but the non-examining medical expert disagreed).

### D.     The ALJ Erred In Finding Bradley Not Credible

Bradley further argues that the ALJ erred in finding that Bradley's testimony was not credible. The Court agrees.[21]

In assessing whether a claimant is disabled, the ALJ may consider the claimant's allegations of pain and functional limitations; however, the ALJ retains the discretion to assess

---

[20]     ALJ Hoppenfeld's decision to discount these opinions as "legal conclusions" is all the more inexplicable given Judge Townes's lengthy discussion of them in *Bradley I*. Indeed, ALJ O'Leary's failure to give due consideration to Drs. Schwartz, Gardella, and Freeman's opinions was a key factor in Judge Townes's remand of Bradley's case. (*See Bradley I* at 29–31). Yet it appears from the transcript that ALJ Hoppenfeld was unaware of *Bradley I* at the first remand hearing (Tr. 529–30), and it is not clear that it played any role in her decision, given that it is never cited in the decision and is not part of the administrative record. The Court is greatly troubled by ALJ Hoppenfeld's seeming ignorance of *Bradley I*, particularly because she repeated many of the same errors identified in *Bradley I* that prompted the remand.

[21]     The Commissioner's brief did not address the ALJ's determination that Bradley lacked credibility.

the claimant's credibility. *See Fernandez*, 2013 WL 1291284, at *18 (citing *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010); *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010)). The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from "a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." 20 C.F.R. § 404.1529(b). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms [to] determine" the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18.

Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, ALJ Hoppenfeld committed error by failing to adhere to the two-step inquiry prescribed in the regulations. The decision states that Bradley's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not supported by the objective evidence," but does not identify the specific evidence in the record contradicting Bradley's testimony. (*See* Tr. 353). Instead, the decision principally compares Bradley's testimony about her pain to her statements about her daily activities. (*See* Tr. 353 (finding Bradley's statements

regarding her daily activities "[we]re consistent with light work and . . . contrary to unrelenting pain complaints.")). By deeming Bradley's testimony not credible solely on the basis of her daily activities, instead of engaging in the two-step inquiry, the ALJ erred. *See Bialek v. Astrue*, No. 11 CV 5220, 2013 WL 316165, at *4 (E.D.N.Y. Jan. 28, 2013) (finding the ALJ improperly discounted the claimant's testimony based on testimony regarding his daily activities). At a minimum, ALJ Hoppenfeld should have determined whether Bradley suffered from "a medically determinable impairment that could reasonably be expected to produce the symptoms" Bradley testified to at the hearing – which, as discussed *infra*, the record did establish.

Furthermore, ALJ Hoppenfeld improperly evaluated Bradley's testimony against a "light work" RFC, despite clear precedent in the Second Circuit stating that that ALJ must assess the claimant's credibility *before* making an RFC finding. *See Fernandez*, 2013 WL 1291284, at *19 (stating the ALJ must assess the claimant's credibility before evaluating the RFC (citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir, 2010)); *Yu v. Astrue*, 963 F. Supp. 2d 201, 217 (E.D.N.Y. 2013) (noting the ALJ put "the proverbial cart before the horse" by incorrectly assuming that any of the claimant's statements that contradicted the RFC lacked credibility); *Smollins v. Astrue*, No. 11 CV 424, 2011 WL 3857123, at *11 (E.D.N.Y. Sept. 1, 2011) (finding error in the ALJ's assessment of the claimant's credibility where the ALJ "merely compared Smollins's statements regarding her symptoms to his own RFC assessment."). Nor did the ALJ consider the other six factors set forth in 20 C.F.R. § 404.1529(c)(3) before deeming Bradley's testimony not credible. *See Fernandez*, 2013 WL 1291284, at *19 (noting ALJ erred by failing to evaluate plaintiff's testimony in light of the seven factors required by SSA regulation).

Because ALJ Hoppenfeld's credibility determination rested solely on Bradley's testimony regarding her ability to engage in daily activities, the Court finds that it was not based

on substantial evidence. A claimant "does not need to be an invalid in order to be found disabled." *Monroe v. Astrue*, No. 12 CV 1456, 2014 WL 3756351, at *7 (E.D.N.Y. July 30, 2014) (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). Indeed, a claimant's ability "to tend to his personal needs and travel to appointments is not indicative of his ability to perform light work." *Bialek*, 2013 WL 316165, at *4; *see also Martin v. Astrue*, 2009 WL 2356118, at *12 (S.D.N.Y. July 8, 2011) (stating the claimant's ability to engage in "mundane tasks of life . . . do[es] not necessarily indicate that [a claimant] is able to perform a full day of sedentary work."). While Bradley did engage in the daily activities of raising two children, driving an SUV locally, exercising periodically and performing some household duties with the help of her son (Tr. 352–53), such conduct does not show that Bradley is capable of performing full time light work. *See Fernandez*, 2013 WL 1291284 at *19–20 (rejecting the Commissioner's argument that the ALJ's adverse credibility determination was supported by substantial evidence based on the plaintiff's engagement in daily activities).

In fact, Bradley's testimony on remand is consistent with the opinions of her treating physicians. She testified that she could stand only for a half hour with very little bending, and that she could sit for a half hour but would have to move around for about 15 minutes before sitting again. (Tr. 633–34). Such testimony is supported by the functional assessments of Drs. Gardella, Schwartz, Freeman and Nour, who all agreed that Bradley could not sit for 6 hours out of an 8-hour workday. Indeed, consistent with Bradley's testimony and these assessments, Bradley had to stand during her testimony at the hearing before ALJ Hoppenfeld to ease the pain she was experiencing. (*Id.* at 567).

Finally, the ALJ erred by failing to evaluate Bradley's long work history of nearly 30 years when making a credibility assessment. (Tr. 441). "A plaintiff with a good work history is

entitled to substantial credibility when claiming inability to work." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). Bradley's 30-year work history entitled her to substantial credibility. *See Fernandez*, 2013 WL 1291284 at *20 (finding the plaintiff was entitled to substantial credibility based on a 25-year work history).

### E. Remand for Calculation of Benefits Is Appropriate

Where the record provides persuasive proof of disability and remand for further evidentiary proceedings would serve no purpose, reversal of the ALJ's decision and remand solely for the calculation and award of benefits is appropriate. *See Fernandez*, 2013 WL 1291284 at *20 (citing *Speruggia v. Astrue*, 2008 WL 818004, at *14 (E.D.N.Y. Mar.26, 2008)); *McKissick v. Barnhart*, No. 01 CV 1550, 2002 WL 31409933, at *16 (E.D.N.Y. Sept. 30, 2002) (finding remand pointless where the medical record confirmed the treating physicians' opinions that plaintiff was disabled and incapable of performing even sedentary work). In *Fernandez*, the district court reversed and remanded solely for the award of benefits where the ALJ (1) "lacked good reasons for failing to give controlling weight to Plaintiff's treating physicians' diagnoses and assessments of Plaintiff's ability to work; (2) improperly adopted wholesale the findings and opinion of the non-examining medical consultant; (3) failed to give any basis for rejecting Plaintiff's testimony of his severe and constant pain; and (4) improperly determined Plaintiff's RFC." 2013 WL 1291284, at *20.

Here, the similarities to *Fernandez* are obvious. Just as in *Fernandez*, the ALJ "disregarded a well-developed record with little explanation," giving the Court "no basis to conclude that remanding to obtain additional evidence would support the Commissioner's decision." *Id*. The evidence in the record clearly shows that Bradley is disabled and incapable of performing even sedentary work. Indeed, the Commissioner's vocational expert conceded that an individual with the impairments described by Dr. Freeman, one of Bradley's treating

physicians, would have a "less than sedentary" RFC, leaving her unable to perform any work. (Tr. 663). Based on this concession, as well as the substantial evidence in the record consistent with Dr. Freeman's opinion, the Court finds that the Commissioner cannot meet her burden in step five to show that Bradley can perform "other work", and that remand for further proceedings on Bradley's RFC would be pointless. Furthermore, the inordinate delay already caused by two rounds of unnecessary appeals in this matter is unconscionable, and the Court cannot countenance any further delay in Bradley receiving her long overdue benefits.[22] Accordingly, the case is remanded solely for the calculation and award of benefits.

## IV. CONCLUSION

For the foregoing reasons, Bradley's motion for judgment on the pleadings is GRANTED and the Commissioner's motion is DENIED. Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Commissioner's decision is reversed. Bradley's claim is remanded to the Commissioner solely for the calculation and award of benefits.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: May 20, 2015
Brooklyn, New York

---

[22] The Court notes that the 12-year history of Bradley's claim, with its repeat appeal, is also similar to *Fernandez*, where the 15-year course of proceedings included multiple remands to the ALJ. *See Fernandez*, 2013 WL 1291284.